IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| M.P. and C.P.,<br><br>     Plaintiffs,<br><br>v.<br><br>BLUECROSS BLUESHIELD OF ILLINOIS, ARTHUR J. GALLAGHER & CO., and the ARTHUR J. GALLAGHER & CO. BENEFITS PLAN,<br><br>     Defendants. | **MEMORANDUM DECISION AND ORDER ON DEFENDANTS' MOTION TO DISMISS**<br><br>Case No. 2:23-cv-216-TC |

  On April 3, 2023, the Plaintiffs filed their Complaint against BlueCross and BlueShield of Illinois (BCBS), Arthur J. Gallagher & Co. (AJG), and the Arthur J. Gallagher Benefits Plan asserting three claims: 1) a claim for recovery of benefits under an ERISA-governed benefits plan; 2) a claim for equitable relief based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 (the Parity Act); and 3) a claim for statutory damages under ERISA based on the Defendants' failure to timely produce documents under which the benefits plan was established or operated. (ECF No. 1 at 8, 10, 15.)[1]

  Before the court is the Defendants' Motion to Dismiss. (ECF No. 13.) The court has elected to determine the motion based on the parties' briefs without the need for oral argument. See DUCivR 7-1(g). The court, having carefully reviewed the briefs submitted by the parties

---

[1] For ease of reference, ECF citations are to PDF pages rather than internal document pages.

1

and the authorities cited therein, and for the reasons discussed below, GRANTS IN PART the Defendants' motion.

## BACKROUND

As alleged in the Complaint, Plaintiff C.P. received medical care and treatment at Cascade Academy (Cascade) from October 5, 2020, to May 15, 2021. It is undisputed that Cascade is a Utah-licensed residential treatment facility located in Wasatch County, Utah. Plaintiff M.P. is a participant in the Arthur J. Gallagher & Co. Healthcare Plan—a self-funded employee welfare benefit plan under ERISA (the Plan).[2] As the child of M.P., C.P. is a beneficiary under the Plan and was a beneficiary under the Plan during the period when C.P. was receiving care at Cascade. M.P. filed claims under the Plan seeking coverage for C.P.'s residential treatment care at Cascade. BCBS, acting as the claims administrator for the Plan, denied M.P.'s claims. As alleged in the Complaint, BCBS denied the claims because it concluded that Cascade did not meet the Plan's requirement for a residential treatment center because it did not have 24-hour onsite nursing services. (ECF No. 1 at ¶¶ 15, 25.)

## LEGAL STANDARD

To survive a motion to dismiss, the factual allegations in a complaint must raise a plausible right to relief. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–56 (2007). A claim is facially plausible when the plaintiff pleads enough factual content to justify the reasonable inference the defendant is liable for the misconduct alleged. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). And while factual allegations asserted in a complaint are accepted as true for purposes of

---

[2] A copy of the Plan was attached as Exhibit 1 to the Defendants' Motion. (ECF No. 14-1.) Because the Plan was referred to in the Complaint and is integral to the Plaintiffs' claims the court may consider it even on a motion to dismiss. See Matney v. Barrick Gold of N. Am., 80 F.4th 1136, 1151 n.11 (10th Cir. 2023) ("A court may consider (1) documents that the complaint incorporates by reference, (2) documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity, and (3) matters of which a court may take judicial notice.) (cleaned up).

2

a motion to dismiss, conclusory allegations in a complaint are not entitled to such deference and are insufficient to state a claim. Id.

## ANALYSIS

**A. Plaintiffs' Denial of Benefits Claim**

The Plan at issue here purports to provide some benefits for the diagnosis and treatment of mental illnesses, including inpatient benefits at the residential treatment center level of care. (See ECF No. 14-1 at 97 (stating that inpatient benefits for covered services "will also be provided for the diagnosis and/or treatment of Inpatient Mental Illness or Substance Use Disorder in a Residential Treatment Center").) Whether such coverage is available depends on the definitions specific to each plan and, usually, a determination under the specific terms of each plan that the care was "medically necessary." In this case, however, no medical necessity review was undertaken. Rather, BCBS focused its claim evaluation on the issue of whether Cascade offered "24 hour onsite nursing service for patients with Mental Illness and/or Substance Use Disorders," which was a requirement for any residential treatment center under the Plan. (Id. at 43.) On December 21, 2021—more than seven months after C.P. completed treatment at Cascade—BCBS informed the Plaintiffs that Cascade "does not meet the definition of a residential treatment [sic] with confirmation of 24-hour nursing presence and M.D. access" and upheld its denial of the Plaintiffs' claim. (ECF No. 1 at ¶ 25.) No further appeal was pursued by the Plaintiffs.

The Plan establishes, and it is undisputed, that it may provide benefits for "Medical Care" visits when a participant is "an Inpatient in a Hospital, a Skilled Nursing Facility, or Substance Use Disorder Treatment Facility or a Residential Treatment Center." (ECF No. 14-1 at 75.) The Plan then defines a "Residential Treatment Center" as:

> [A] facility setting offering a defined course of therapeutic intervention and special programming in a controlled environment which also offers a degree of security, supervision, structure and is licensed by the appropriate state and local authority to provide such service.
>
> It does not include halfway houses, supervised living, wilderness programs, grouphomes, boarding houses or other facilities that provide primarily a supportive environment and address long-term social needs, even if counseling is provided in such facilities. Patients are medically monitored with 24 hour medical availability and 24 hour onsite nursing service for patients with Mental Illness and/or Substance Use Disorder.

(Id. at 43.)[3]

BCBS argues in its Motion that dismissal of the Plaintiffs' claim for benefits is warranted because Cascade does not provide 24-hour onsite nursing as is required of a residential treatment center under the Plan. Recently, when faced with a nearly identical claim concerning BCBS and this 24-hour onsite nursing requirement, the court granted summary judgment to BCBS on a benefits denial and a Parity Act claim. See D.B. ex rel. A.B. v. United Healthcare Ins. Co., No. 1:21-cv-98, 2023 WL 3766102, at *4–*5 (D. Utah June 1, 2023). Although that was a summary judgment determination, the court's reasoning in D.B. is equally applicable to Defendants' Motion to Dismiss.

As in D.B., the Plaintiffs here do not dispute that Cascade does not offer 24-hour onsite nursing. (See ECF No. 1 at ¶ 51 (acknowledging that treatment at Cascade "does not include or require on-site nurses or doctors 24/7").) Because Cascade did not satisfy the Plan's unambiguous requirement of 24-hour onsite nursing care, coverage for C.P.'s treatment at Cascade was not available under the Plan and BCBS appropriately (under the Plan and ERISA) denied the Plaintiffs' claim. Accordingly, the Plaintiffs' claim for benefits is without merit.

---

[3] The court notes that the Plaintiffs sought benefits for a period from October 2020 through May 2021. The only relevant Plan documents referenced by the Defendants, however, are for the 2021 version of the Plan, which was not effective until January 1, 2021. (ECF No. 14-1 at 166.)

B. **Plaintiffs' Parity Act Claim**

The Plaintiffs' Parity Act claim[4] rests on allegations that the Plan's 24-hour onsite nursing requirement imposed "more stringent or restrictive eligibility criteria for residential treatment centers … [than] the Plan applies to analogous intermediate levels of medical or surgical benefits." (ECF No. 1 at ¶ 45.) The Plaintiffs allege that no "licensing, regulatory, or accreditation entities" require residential treatment centers to have nurses onsite or present 24 hours a day." (Id. ¶¶ 52–53.) The Plaintiffs also maintain that such a requirement is "stricter than those dictated by generally accepted standards of care." (Id. ¶ 54.) By imposing such a requirement, Plaintiffs assert that the Plan violates the Parity Act. Further, the Plaintiffs allege that even though the same 24-hour requirement may be imposed on analogous intermediate levels of medical treatment and care, such as skilled nursing facilities, the same requirement imposed on a residential treatment center for mental health care violates the Parity Act because, while 24-hour nursing care is part of the generally accepted standards of care for skilled nursing facilities, it is neither expected nor required under generally accepted standards of care for a residential treatment facility providing mental health care. (Id. ¶¶ 55–58.)

Unlike the D.B. case, the Plaintiffs here do not dispute that under the Plan the analogous intermediate levels of care at skilled nursing facilities or inpatient rehabilitation hospitals also include 24-hour nursing requirements.[5] Therefore, because the Plaintiffs have not plausibly

---

[4] To establish a Parity Act claim, a plaintiff must: (1) identify a plan subject to the Parity Act that provides both medical/surgical benefits and mental health benefits; (2) identify a treatment limitation for mental health benefits in the plan that is more restrictive than medical/surgical benefits; and (3) establish that the mental health benefit that is so limited is in the same classification as the medical/surgical benefit with which it is being compared. See M.S. v. Premera Blue Cross, 553 F. Supp. 3d 1000, 1028 (D. Utah 2021) (stating elements).

[5] In their opposition brief, the Plaintiffs assert that 24-hour services are not required for a "Hospice Care Program" under the Plan. (ECF No. 19 at 7.) As an initial matter, hospice care has not been universally accepted as an appropriate analogue under the Parity Act to intermediate levels of care such as residential treatment centers or skilled nursing facilities. In addition, Medicare regulations and Utah licensing

alleged that the Plan's 24-hour onsite nursing requirement presents a more restrictive limitation when compared to skilled nursing facilities or other analogous levels of intermediate care, their Parity Act claims must be dismissed. See D.B., 2023 WL 3766102, at *4–*5.

Although D.B. addressed this issue in the context of a summary judgment motion, the same result is warranted under a motion to dismiss standard. For example, in J.W. v. Bluecross Blueshield of Tex., No. 1:21-CV-21, 2022 WL 2905657 (D. Utah July 22, 2022), the court granted the defendant's motion to dismiss on a similar Parity Act claim. Although the plaintiff in J.W. (unlike Plaintiffs here) alleged that the plan at issue did not expressly impose a 24-hour onsite nursing requirement on skilled nursing facilities, the court found that such a requirement was nevertheless present because the plan required the analogous facilities to be licensed under state law or be Medicare eligible, both of which required 24-hour nursing care. Id. at *5. Accordingly, the court found there was no "disparity with regard to the 24-hour onsite nursing services requirement between residential treatment centers and skilled nursing facilities." Id. at *6.

---

regulations require inpatient hospice facilities (which appear to be an appropriate analogue to the inpatient residential treatment service that C.P. received at Cascade) to provide 24-hour nursing services. See 42 C.F.R § 418.110(b)(1); U.A.C. R432-750-22. And the Plan itself provides that "Hospice Care Program Service" is available at skilled nursing facilities, which require 24-hour nursing service, and at "special hospice care units," which, as discussed above, require 24-hour nursing. (ECF No. 14-1 at 32.) To the extent the Plan may also provide for "Hospice Care Program" benefits in the home, that outpatient service–even if it does not require 24-hour nursing—is not analogous to the inpatient treatment received at a residential treatment center. Indeed, the Plan categorizes home hospice care as an "outpatient" service, while care for mental illness at a residential treatment center is considered an "inpatient" service. (ECF No. 14-1 at 53, 74, 96.) And finally, in their Parity Act allegations, the Plaintiffs referred only to "inpatient hospice care" as an analogue, which, as noted above, requires 24-hour nursing services. (See ECF No. 13 at ¶ 46); see also Final Rules under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008; Technical Amendment to External Review for Multi-State Plan Program, 78 Fed. Reg. 68240-01 (Nov. 13, 2013) ("[I]f a plan … classifies care in skilled nursing facilities or rehabilitation hospitals as inpatient benefits, then the plan … must likewise treat any covered care in residential treatment facilities for mental health … as an inpatient benefit").

The Plaintiffs allege that, because applicable generally accepted standards of care do not require 24-hour nursing for the treatment of adolescent mental health issues at a residential treatment center, they have therefore stated a Parity Act claim. But those conclusory allegations are insufficient. The Parity Act and the regulations promulgated under the Parity Act establish that when a nonquantitative treatment limitation, such as a 24-hour nursing requirement, is imposed upon a mental health benefit under a regulated plan, the imposition of that limitation must be comparable to and applied no more stringently than the same limitation with respect to medical/surgical benefits in the same classification. See 29 C.F.R. § 2590.712(c)(4)(i); 29 U.S.C. § 1185a(a)(3)(A)(ii). The Plaintiffs do not dispute that skilled nursing facilities fall within the same classification as residential treatment centers under the Parity Act. The Plan's application of the same 24-hour onsite nursing requirement to a residential treatment center offering mental health care, such as Cascade, that it also imposes on treatment at a skilled nursing facility does not violate the Parity Act. See D.B., 2023 WL 3766102, at *4–*5.

Though the Plaintiffs suggest that there are generally accepted standards of care for adolescent mental health residential treatment that do not require 24-hour nursing services, they have not alleged what they are or how they would apply. The Defendants, however, have presented the "Principles of Care for Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment Centers" (Principles) that were developed by the American Academy of Child & Adolescent Psychiatry. (ECF No. 14-4.) These Principles state that a residential treatment center should have either a "registered nurse with at least one year experience in mental health services or a mental health worker … to provide 24 hour developmentally sensitive child supervision, leisure, and supportive care." (Id. at 3.) Thus, even if the court could consider generally accepted standard of care guidelines under the Parity Act,

7

the only such guidelines before the court suggest that a 24-hour nursing requirement is at least consistent with such generally accepted practices.[6]

In the Plaintiffs' opposition brief, they correctly point out that this court has indicated its concerns about the continued reliance on so-called analogous or comparable treatments to evaluate Parity Act claims. See D.B., 2023 WL 37661016, at *5 n.5. The court still has those concerns. But relief from those concerns does not rest with the court, which must apply the Parity Act and its attendant regulations consistent with their terms. Rather, any such relief lies with the executive or legislative branches, who are constitutionally empowered to make such changes. Whether comparison to a medical/surgical "analogue" is an appropriate means to establish "parity" with mental health benefits, or if "parity" is even the appropriate goal, are issues ripe for reconsideration.

### C. Plaintiffs' Statutory Claim for Failure to Produce Documents

The Plaintiffs' third claim seeks damages under 29 U.S.C. § 1132(c)(1) for the Defendants' failure to produce documents Plaintiffs requested. The Plaintiffs have alleged that the Defendants have failed to produce documents under which the Plan was "established or operated," including administrative service agreements between the Plan and BCBS, the "medical necessity criteria" used both for mental health and substance abuse and skilled nursing facilities, and documents used to apply a "nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan"— essentially the Defendants' Parity Act analysis. (See ECF No. 1 at ¶¶ 26, 66, 69.)

---

[6] The Plaintiffs have not established that the Parity Act permits any analysis of the purportedly different generally accepted standards of care for mental health care at a residential treatment center in making the "comparable" or "more stringently applied" assessment that is the focus of a Parity Act nonquantitative treatment limitation evaluation.

The Defendants' primary opposition to this claim is that the Plaintiffs sent their request to the wrong address. The Defendants also argue that even if a claim can be stated against the Plan administrator, there is no statutorily permissible claim against BCBS, which was the Plan's claims administrator. And the Defendants further argue that, in any event, the Plaintiffs have not named the correct entity as the Plan administrator.

Turning to the Defendants' second and third arguments first, the Defendants are correct that a statutory claim under 29 U.S.C. §1132(c)(1) is not available against a claims administrator, such as BCBS, but is only viable against the Plan administrator. See Thorpe v. Ret. Plan of the Pillsbury Co., 80 F.3d 439, 444 (10th Cir. 1996). It is incontrovertible that BCBS served as the claims administrator, not the Plan administrator. (See ECF No. 1 at ¶¶ 1–2 (alleging that BCBS is the "third-party claims administrator").) But unlike in Thorpe, Plaintiffs here also attempted to include the Plan administrator as a named defendant. See 80 F.3d at 444 (affirming dismissal where complaint failed to name the plan administrator). Although the Plaintiffs acknowledge that they have misnamed the Plan administrator in the Complaint, they argue that they should be given leave to amend their pleading to correctly name the Plan administrator, Arthur J. Gallagher (Illinois), LLC, as a defendant and assert a statutory claim against it. The Defendants did not substantively respond to the Plaintiffs' argument. The court finds that such relief is warranted, especially where the Plan (as submitted by the Defendants) failed to identify the Plan administrator by name but only referred to "Arthur J Gallagher & Co."—the very entity that the Plaintiffs initially named as a Defendant. (See ECF No. 14-1 at 2–3.)

In addition, the court is not persuaded by the Defendants' argument that the Plaintiffs' claim is foreclosed because the Plaintiffs sent their document request to the wrong address. First, none of the non-binding cases cited by the Defendants dismissed a § 1132(c)(1) claim at the

motion to dismiss stage. Second, the Complaint alleges that the Defendants sent some documents to the Plaintiffs following their request. (ECF No. 1 at ¶¶ 27, 69.) At least at this stage, these facts suggest that the Plan administrator may have received actual notice of the Plaintiffs' request. Third, it appears that the Plan itself did not provide any address for the Plan administrator. (ECF No. 14-1.) Whether sending their request to some other address (perhaps the only or last known address the Plaintiffs had from a prior summary plan description (ECF No. 19 at 14))—while also copying the claims administrator—was reasonable or sufficient under these circumstances remains an open issue.[7] Perhaps the Plaintiffs can adequately allege that this was the only address they had and that the Plan administrator nevertheless received notice of their request.[8] Cf. N.R. ex rel. S.R. v. Raytheon Co., 24 F.4th 740, 753 (1st Cir. 2022) (denying motion to dismiss § 1132(c)(1) claim where plaintiff alleged he requested the information by contacting, among others, his employer who sponsored the plan). This result is particularly appropriate where, as here, the Plaintiffs suggest that they re-sent their requests to the actual address of the Plan administrator, albeit under the wrong name. (See ECF No. 19 at 14.)

## ORDER

Accordingly, for the foregoing reasons,

IT IS ORDERED that the Defendants' Motion to Dismiss (ECF No. 13) is GRANTED IN PART and the Plaintiffs' Complaint is dismissed without prejudice.

---

[7] In contrast, in Mouton v. Mobil, No. 00-CV-1403, 2001 WL 963957, at *10 (S.D. Tex. June 18, 2001), a case cited by the Defendants, the court noted that although the plan administrator had included an incorrect address in the plan documents it later published its new address to all participants.

[8] The court notes that under § 1132(c)(1) a plan administrator may furnish the requested documents to the requesting participant's "last known address." It would be incongruous to interpret the statute to permit a plan to utilize a "last known address" in complying with the disclosure requirements while foreclosing a participant from the same, particularly when it may be established that the plan received or was informed of the request.

IT IS FURTHER ORDERED that the Plaintiffs are GRANTED leave to replead their claims (if they can) consistent with this Decision and Order. Any amended pleading must be filed within 30 days of the date of this Order.

DATED this 7th day of December, 2023.

BY THE COURT:

_Tena Campbell_
Tena Campbell
United States District Judge